**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190555-U

Order filed November 17, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| SHEILA KARGLE, | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Grundy County, Illinois, |
| | ) | |
| v. | ) | |
| | ) | Appeal No. 3-19-0555 |
| | ) | Circuit No. 14-L-20 |
| TIMOTHY J. SANDERS, D.O., JOSEPH S. | ) | |
| KOKOSZKA, M.D., and MORRIS HOSPITAL | ) | |
| AND HEALTHCARE CENTERS, | ) | Honorable |
| | ) | Robert C. Marsaglia, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices McDade and Wright concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*: The trial court did not err by granting the defendants' motion for summary judgment.

¶ 2      The plaintiff, Sheila Kargle, appeals the granting of the motion for summary judgment filed by the defendants, Dr. Timothy J. Sanders, Dr. Joseph S. Kokoszka, and Morris Hospital and Healthcare Centers. In doing so, Kargle argues that the circuit court erred in (1) holding that she needed to name Dan Riordan in order to invoke the doctrine of *res ipsa loquitur* or, in the

alternative, failing to find that she named Riordan as an apparent agent, and (2) finding that none of her experts could point to a non-speculative opinion as to the breach of the standard of care.

¶ 3                                                    I. BACKGROUND

¶ 4          In June 2013, Kargle filed a complaint in Will County, raising three counts: (1) *res ipsa loquitur* against all the defendants; (2) direct negligence against Sanders and Kokoszka, individually and as agents of Morris Hospital; and (3) direct negligence against Morris Hospital. The case was ultimately transferred to Grundy County for *forum non conveniens*.

¶ 5          Kargle's complaint stemmed from a colorectal surgery she underwent to remove skin tags and hemorrhoids and to fix a fissure tear on December 22, 2011. According to Kargle's deposition, she had met with Dr. Kokoszka at his office at Illinois Valley Surgical Associates in Ottawa to discuss the procedure prior to the surgery. Dr. Kokoszka told Kargle the risks of surgery, including bleeding and incontinence. No one ever mentioned a risk of shoulder injury. Dr. Kokoszka also told her the days of the week he was at Morris Hospital and the days of the week he was at the hospital in Ottawa, and Kargle picked the day that worked best for her, which placed the surgery at Morris Hospital. The last thing Kargle remembered before surgery was being wheeled into the operating room (OR). She saw quite a few people in scrubs but did not recognize any of them. She had no memory of being moved from the gurney to the OR table. The first thing she remembered after the surgery was excruciating pain in her left shoulder and screaming, "My shoulder, my shoulder. What happened to my shoulder? *** You were supposed to operate on my ass, not my shoulder." She was given pain medication, which dulled the pain. Prior to the rectal surgery, she had not had any issues with her shoulder and had never injured it. Ultimately, Kargle had a second surgery to fix damage to her rotator cuff. Even after the surgery, Kargle still experienced pain and loss of motion to her shoulder.

2

¶ 6        Through the depositions of Dr. Kokoszka, Dr. Sanders, and Julie Brozak, the following facts were undisputed: Dr. Kokoszka was Kargle's surgeon and had staff privileges at Morris Hospital, but he was self-employed by his corporation, Illinois Valley Surgical Associates. Approximately 60 to 65% of his practice was made up of colorectal surgeries, and he performed procedures like those Kargle received three to four times a week, since 1996. Dr. Sanders was the anesthesiologist. He also had privileges at Morris but was not an employee of Morris. Instead, he had his own corporation: Anesthesia Consultants of Morris. There were also at least four nurses in the room. Three of the nurses were employees of Morris Hospital, including Julie Brozak, Gretchen Poyner, and Michelle Stewart. Nurse anesthetist (CRNA), Riordan, was not an employee of Morris Hospital, but was instead employed by Anesthesia Consultants. Kokoszka, Sanders, Riordan, Brozak, Poyner, and Stewart made up the surgical team. The surgery required the surgical team to move Kargle, while she was unconscious, from her back on a gurney, to her stomach on the OR table. Kokoszka was standing on the opposite side of the OR table with his arms out ready to catch Kargle as she was rolled onto his arms on the table. The rest of the surgical team then rolled Kargle onto her right side and then onto her stomach on Kokoszka's arms. The team then positioned her arms at 90-degree angles on arm boards. Dr. Kokoszka, Dr. Sanders, and Brozak stated that they had never seen a shoulder injury like this happen in such a procedure before. None of them remembered anything actually happening to her left arm during surgery, and all three of them stated that positioning her and making sure her arm was in the correct position the whole time would have been the responsibility of the entire surgical team.

¶ 7        Neither Dr. Kokoszka, Dr. Sanders, nor Brozak could remember with certainty the positioning of the rest of the team during the transfer onto the OR table. Kokoszka stated Dr. Sanders was at Kargle's head and the nursing staff would have been at her left side and by her feet.

3

He did not recall how many nurses helped with the positioning or where they were located. Dr. Kokoszka stabilized her right arm while Kargle was turned onto his arms and the OR table. Dr. Kokoszka stated that her left arm would be held in place by the nurses who were lifting her and, as they turned her toward Dr. Kokoszka, Kargle's left arm was turned into and stabilized by Dr. Kokoszka's arms and chest. Dr. Kokoszka stated it was the duty of the entire surgical staff to ensure the safe positioning of Kargle. The nurses would then secure both arms while Dr. Kokoszka removed his arms from under Kargle. Her arms would then have been placed on arm boards by the nurses, not by Dr. Kokoszka. He could not say whether Dr. Sanders helped in positioning Kargle's arms.

¶ 8       When moving Kargle to the OR table, Dr. Sanders said that he was at Kargle's left side, Riordan was at Kargle's head, Dr. Kokoszka was on the other side of the OR table to receive Kargle, and Brozak was at Kargle's feet. Dr. Sanders stated that he held onto Kargle's left arm while rolling her over to Dr. Kokoszka. Once Kargle was turned onto her stomach, Dr. Sanders stated that he was concerned with positioning her right arm and dealing with her head and airway with Riordan so he did not know who touched her left arm at that point. He did not know who positioned her left arm but stated that it would have been either a nurse or Dr. Kokoszka.

¶ 9       Brozak stated that, prior to positioning, Riordan was on the right side of Kargle's head, Sanders was on the left side of Kargle's head, Stewart was on Kargle's left, and Brozak was at her feet. This would have placed Riordan at the left side of Kargle's head after she was flipped onto her stomach. Brozak stated that she did not remember who positioned Kargle's left arm onto the arm board once she was moved into the prone position, but that it was either Dr. Kokoszka, Dr. Sanders, or Riordan. However, Brozak did remember someone saying, "her shoulder seems awful tight or her arm seemed awful tight." She believed it was a comment made by Riordan to Dr.

4

Sanders during the initial positioning. She believed that the comment referred to some resistance when they were moving her arm to position it, but she did not know which arm they were referring to. Brozak stated that later she was working on another patient when she overheard Dr. Sanders tell Riordan that he was going to have to get an x-ray for Kargle. Riordan responded, "I wondered if the succs wore off." Brozak stated that "succ" was the short form of succinylcholine, a muscle relaxant that is administered to a patient prior to intubation.

¶ 10        Dr. Sanders left the room before the surgery began. The same procedure was employed to move Kargle back onto her back on the gurney after surgery, but neither Dr. Kokoszka nor Dr. Sanders were in the room or helped with that transfer, and Brozak did not remember who was positioned where. Dr. Kokoszka, Dr. Sanders, and Brozak all stated that they complied with the standard of care.

¶ 11        Kargle procured three experts and depositions were taken of each of them. According to the interrogatories supplied by Kargle, all three experts would testify that the shoulder injury should not have happened absent negligence and that the standard of care may have been violated in one of the following six ways: (1) Kargle's arm was not secured alongside her body upon moving her onto the OR table or off the OR table, (2) her left arm was not secured when she was being caught and her arm was allowed to flail or drop, (3) her arm was brought up and over the plane of her body or was overstretched more than 90 degrees when it was being positioned onto the arm board, (4) her arm fell and/or was allowed to flail if the arm came off the arm board or the arm board came undone during surgery, (5) her arm was allowed to move because it was not being monitored by the surgical team or was not secured to the arm board, or (6) Kargle or her arm moved when the muscle relaxant wore off.

5

¶ 12        Dr. Marjean E. Eastmond testified that she had never given her deposition as an expert and had never reviewed any other cases. She had never testified in court as an expert. She was an anesthesiologist for Midwest Anesthesia Partners, Lincoln Park Division. She had done over 1000 procedures in the prone position, such as colorectal procedures. She stated that she was not aware of any patients developing shoulder problems in a surgery like this. She stated that it was her opinion that Kargle's left shoulder was somehow damaged during surgery, but she did not have an opinion as to how the injury occurred. She stated that the potential mechanisms of injury were the six stated above. *Supra* ¶ 11. It was her opinion that it was more likely that the injury occurred when positioning the patient onto the OR table or moving her back onto the bed. She stated that she did not have any specific criticisms as to any of the specific members of the surgical team because she did not know which person performed which task. She stated that it was the duty of the whole surgical team to move, position, and monitor Kargle's arms, and that Riordan was a member of the surgical team and was present at all times before, during, and after the procedure.

¶ 13        Dr. Marc Brand was board certified in colorectal surgery and general surgery and stated that he believed the injury to Kargle's shoulder occurred while she was in the operating room but did not know how. He stated that the surgical team violated the standard of care, but could not pinpoint the specific person, action, or time. He based his opinion that the standard of care had been violated on the fact that an injury occurred; there was no description by anyone involved that they performed an action that violated the standard of care. His report listed six areas where the standard of care could have been violated (*supra* ¶ 11), but he did not have any evidence that any of those events actually occurred. He agreed that his opinions about the potential causes of the injury were based on speculation and conjecture. He stated that if Kargle was not positioned properly, causing the injury, the entire surgical team, which included Riordan, would be

responsible for the injury. Brand stated that the only way Riordan would have known Kargle's shoulder was tight, as in Brozak's deposition, was if he moved it at some point. He stated he thought it was more likely that the injury occurred when Kargle was being positioned before surgery. However, he stated that he could not say to a reasonable degree of medical certainty that the injury occurred before the surgery.

¶ 14 Mary Flanagan was Kargle's nursing expert. She was a staff nurse in the OR at Skokie Hospital and was on the board of directors for the Association of Legal Nurse Consultants. She stated that she could not point to a specific movement that might have caused the injury. She stated in this case the surgical team responsible for the transfer included Riordan. She stated that a CRNA, like Riordan, should participate in the positioning of the patient and may, in her experience, have a preference as to how a patient's arms are secured to the arm board during surgery. A CRNA has an obligation not to allow the procedure to move forward if he or she believes the positioning is improper. She agreed that she had no evidence that any of the possibilities listed in the interrogatories (*supra* ¶ 11) actually occurred; whether any of them occurred would be speculation. In her experience, the CRNA would remain at the head of the bed maintaining the patient's airway. It was her opinion that the entire surgical team violated the standard of care, stating, "We work as a team. Every team member has their role, and it's vital that there is communication and coordination of that team. We are responsible. Every single person in the room is responsible for the care of that patient." She stated that if a patient is injured during the positioning, the entire surgical team would be liable. She agreed that neither Dr. Kokoszka's deposition nor the medical records stated where Riordan was positioned. She agreed that Brozak stated that she did not know exactly where Riordan was other than that he was next to Dr. Sanders, and she did not mention

7

him any other time in her deposition. Neither Dr. Kokoszka, Dr. Sanders, nor Brozak mentioned what Riordan did during the surgery.

¶ 15    In June 2018, the court granted partial summary judgment in favor of Morris Hospital, solely finding that neither Dr. Sanders nor Dr. Kokoszka were actual or apparent agents of Morris Hospital. Kargle did not appeal from this finding.

¶ 16    All the defendants filed motions for summary judgment in November 2018 as to the remaining claims. The motions alleged Kargle failed (1) to join Riordan, a necessary party, which was fatal to her *res ipsa loquitor* claim and (2) to show evidence of breach of the standard of care or causation of her injuries. A hearing was held on the motions, after which the court took the matter under advisement. The court ultimately granted the motions for summary judgment. On the *res ipsa loquitur* claim, the court stated that the record was clear that Dr. Kokoszka, Dr. Sanders, Riordan, and the nurses employed by Morris Hospital were present and made up the surgical team responsible for Kargle's care and safety. The court stated that Riordan routinely checked the shoulders of Kargle, noting that one was tight. The court found that the failure to name Riordan was fatal to Kargle's claim, stating,

> "The Plaintiff must eliminate the possibility that the injury was caused by someone other than Defendants. Plaintiff argues that Riordan's responsibilities were not focused on the arms and shoulders but rather the head, neck and airway. However, experts have opined that each member of the team is responsible for the safety of the Plaintiff. The case of *Gatlin v. Ruder* is distinguishable from the case at bar. In *Gatlin* both the physician and the hospital were named."

8

As to the direct negligence count, the court stated, "Plaintiff's experts have opined that this type of injury should not occur in the absence of a breach of the standard of care in an operating room. However, no expert can point to a non-speculative opinion as to the breach of standard of care." Kargle filed a motion to reconsider, which was denied. In doing so, the court noted that Kargle's own experts stated that the entire surgical team was responsible for Kargle during the procedure, and therefore, Riordan should have been named.

¶ 17                                    II. ANALYSIS

¶ 18        On appeal, Kargle argues that the court erred in granting the defendants' motion for summary judgment. Summary judgment should only be granted if the movant's right to judgment is clear and free from doubt. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). In determining whether the moving party is entitled to summary judgment, the court must construe the pleadings and evidentiary material strictly against the moving party. *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186 (2002). Summary judgment is appropriate when " 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 28 (quoting 735 ILCS 5/2-1005(c) (West 2008)). "Although the burden is on the moving party to establish that summary judgment is appropriate, the nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law." *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010). We review the circuit court's decision to grant a motion for summary judgment *de novo*. *Palm*, 2013 IL 110505, ¶ 28.

¶ 19                               A. *Res Ipsa Loquitur*

9

¶ 20	Kargle first argues that the court erred in finding that she needed to name Riordan as a party to invoke the doctrine of *res ipsa loquitur*. In order to state a *prima facie* case of *res ipsa loquitur*, Kargle had to establish that she was injured "(1) in an occurrence that ordinarily does not happen in the absence of negligence, (2) by an agency or instrumentality within the defendant's exclusive control." *Heastie v. Roberts*, 226 Ill. 2d 515, 531-32 (2007). The parties do not dispute the first element. Thus, the only question is whether she was injured by an agency or instrumentality within the exclusive control of the defendants.

> "In setting forth the second element, some authorities speak of 'management and control' rather than 'exclusive control,' but the terms have come to be viewed as interchangeable. In either case, the requisite control is not a rigid standard, but a flexible one in which the key question is whether the probable cause of the plaintiff's injury was one which the defendant was under a duty to the plaintiff to anticipate or guard against." *Id.* at 532.

¶ 21	In *res ipsa loquitur* actions, "all parties who could have been the cause of the plaintiff's injuries are joined as defendants. This helps to preserve the identification element because liability will surely fall on the actual wrongdoer." *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 257 (1990). Stated another way, the defendants' responsibility for the cause of the event arises through eliminating the responsibility of any other person. *Nichols v. City of Chicago Heights*, 2015 IL App (1st) 122994, ¶ 46. The doctrine of *res ipsa loquitur* does not apply when (1) possible alternative causes exist and the plaintiff is unable to establish that the defendants' actions specifically caused the injury, (2) an injury could have a non-negligent cause, or (3) the plaintiff failed to name all persons or entities who might have caused the injuries. *Raleigh v. Alcon*

*Laboratories, Inc.,* 403 Ill. App. 3d 863, 869-70 (2010). Thus, a "plaintiff's failure to name as defendants all of the entities who might have caused [her] injuries is fatal to the action." *Id.* at 870.

¶ 22    Here, Kargle failed to name Riordan as a defendant. Riordan was one of the few people who made up the surgical team. Kargle's own experts stated that the entire surgical team would be responsible for the injury and would have violated the standard of care. They all agreed that this included Riordan. Thus, Kargle's failure to name Riordan as a party was fatal to her *res ipsa loquitur* claim.

¶ 23    Kargle argues that all the evidence pointed to Riordan standing by her head during the procedure to maintain her airway, and, therefore, he would not have had any responsibility for her arm. First, our review of the record shows that some evidence did point to Riordan potentially having contact with Kargle's arm. Kokoszka stated that the "nurses" helped to position Kargle prior to the surgery, which could have included Riordan. Brozak stated that Riordan would have been on the left side of Kargle's head after Kargle was flipped onto her stomach. He very well could have been the one positioning her left arm prior to surgery or could have helped with it when positioning her after surgery. Second, Brozak heard Riordan say to Sanders that Kargle's arm or shoulder felt tight. Kargle's expert, Brand, stated that Riordan would have been touching her arms and shoulders to monitor them. Third, as stated above, even if he was just at Kargle's head, Kargle's own experts stated that he, along with the rest of the surgical team, was still under a duty to guard against any injury to Kargle. Thus, Kargle failed to name as a party a person that may have caused her injuries. *Id.*

¶ 24    In coming to this conclusion, we find the cases cited by Kargle inapposite. See *Drewick v. Interstate Terminals, Inc.*, 42 Ill. 2d 345 (1969); *Kolakowski v. Voris*, 83 Ill. 2d 388 (1980); *Barkei v. Delnor Hospital*, 176 Ill. App. 3d 681 (1988); *Gatlin v. Ruder*, 137 Ill. 2d 284 (1990); *Willis v.*

11

*Morales*, 2020 IL App (1st) 180718. In each of these cases, separate entities were in control at various times, and, therefore, there were disputes regarding who was actually in control when the injury occurred. Here, there is no such dispute; exclusive control rested on the entire surgical team when the injury occurred. Therefore, failure to name Riordan, a member of the surgical team, as a party in the lawsuit is fatal to Kargle's case. We note, for clarity, that it is undisputed that the other nurses on the surgical team were employees and actual agents of Morris Hospital. Thus, they were named as parties through Morris Hospital and did not need to be named separately. In contrast, Riordan was employed by Anesthesia Consultants, not Morris Hospital, and neither Riordan nor Anesthesia Consultants were named as defendants.

¶ 25        In the alternative, Kargle argues that, if it was necessary for her to name Riordan as a party, she did so by naming him as an apparent agent of Morris Hospital. Thus, she argues that the court erred in failing to consider her apparent agency claim. "A complaint relying on agency must plead facts which, if proved, could establish the existence of an agency relationship. It is insufficient to merely plead the legal conclusion of agency." *Connick v. Suzuki Motor Co.*, *Ltd.*, 174 Ill. 2d 482, 498 (1996); see also *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 183-84 (2006) (holding that a plaintiff must plead and prove the doctrine of apparent agency).

¶ 26        Kargle does not point to any place in the complaint where she alleged that Riordan was an apparent agent of Morris Hospital, and our review of the record shows that she did not do so. Moreover, Kargle does not cite to any caselaw for the proposition that she does not have to plead an agency relationship. Kargle failed to plead that Riordan was an agent of Morris Hospital, and the court did not err in failing to consider an issue that was not plead.

¶ 27                              B. Direct Negligence

12

¶ 28 Lastly, Kargle argues that the court erred in finding that none of her experts could point to a non-speculative opinion as to the breach of the standard of care. In a medical negligence action, the plaintiff must establish: (1) the standard of care, (2) a deviation from the standard of care by the defendants, and (3) that the plaintiff's injury was proximately caused by that deviation from the standard of care. *Hussung v. Patel*, 369 Ill. App. 3d 924, 931 (2007). "The causal connection must be established to a reasonable degree of medical certainty and 'must not be contingent, speculative, or merely possible.' " *Shicheng Guo v. Kamal*, 2020 IL App (1st) 190090, ¶ 19 (quoting *Buck v. Charletta*, 2013 IL App (1st) 122144, ¶ 59). When a plaintiff fails to present facts that indicate negligence is the probable cause, rather than merely a possible cause, the defendant is entitled to summary judgment. *Geelan v. City of Kankakee*, 239 Ill. App. 3d 528, 531 (1992). For direct medical negligence, like here, the plaintiff cannot rely solely on the existence of an injury; there must be affirmative evidence of negligence. *Kemnitz v. Semrad*, 206 Ill. App. 3d 668, 675 (1990).

¶ 29 Here, Kargle's experts provided six potential ways in which the surgical team could have deviated from the standard of care. *Supra* ¶ 11. Each of the experts stated that these were possible causes of her injury. No one could point to the specific cause of Kargle's shoulder injury, nor could any of the experts state that any of the potential causes actually occurred. The expert opinions were entirely speculative. Moreover, each of the potential causes could not be attributed to every single defendant. Sanders was not in the room once surgery began, and neither Kokoszka nor Sanders were in the room when Kargle was moved back to the gurney. Therefore, the court did not err in granting the motion for summary judgment.

¶ 30                                             III. CONCLUSION

¶ 31 The judgment of the circuit court of Grundy County is affirmed.

13

¶ 32        Affirmed.