RHODA MAE McMILLEN, Plaintiff-Appellant, *v*. CARLINVILLE AREA HOSPITAL, Defendant-Appellee.

Fourth District   No. 4—82—0462

Opinion filed May 25, 1983.—Rehearing denied June 15, 1983.

H. Carl Runge, Jr., of Runge & Gumbel, P.C., of Collinsville, for appellant.

Richard F. Record, Jr., of Craig & Craig, of Mattoon, for appellee.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

This appeal presents another facet in a rapidly developing area of the law: the application of the doctrine of *res ipsa loquitur* to cases of medical malpractice.

The cause was tried to a jury in the circuit court of Macoupin County on a two-count complaint sounding in malpractice; count I alleged a theory of *res ipsa loquitur* (hereinafter for convenience RIL), and count II alleged ordinary negligence. At the conclusion of the plaintiff's evidence the trial court directed a verdict in favor of the defendant on the RIL count; the jury returned a verdict in favor of the defendant on the ordinary negligence count. Plaintiff appeals, claiming that the directed verdict was erroneous, or, alternatively, that there was an abuse of discretion on the part of the trial court in denying her motion for continuance. In either event, plaintiff seeks a remandment for a new trial. We disagree and affirm.

Since the directed verdict came at the close of the plaintiff's evidence and since the plaintiff has not appealed the verdict of the jury on count II, we must view the evidence as it existed at the time of the trial court's ruling. The jury's verdict cannot be used to support that ruling; it was not in existence at the time. We are aware that this court has upon a prior occasion indicated differently. (*Alton v. Kitt* (1982), 103 Ill. App. 3d 387, 395, 431 N.E.2d 417, 423.) Upon further reflection we are of the opinion that the statement in *Alton* was mistakenly made and we decline to follow it.

The plaintiff's evidence showed that she entered the defendant hospital for correction of a bladder problem. Early in the morning of May 22, 1978, X rays of her kidneys were made. Part of that procedure is to inject the patient with a dye which causes clear images of the kidneys to appear on the X-ray films. The dye is injected intraven-

ously.

Admitted into evidence was an exhibit containing the manufacturer's recommendations for the use of the dye. In pertinent part these provide:

> "Severe, life-threatening reactions suggest hypersensitivity to the radiopaque agent, which has prompted the use of several pretesting methods, none of which can be relied upon to predict severe reactions. Many authorities question the value of any. A history of bronchial asthma or allergy, a family history of allergy, or a previous reaction to a contrast agent warrant special attention. Such a history, by suggesting histamine sensitivity and a consequent proneness to reactions, may be more accurate than pretesting in predicting the likelihood of a reaction, although not necessarily the severity or type of reaction in the individual case.
>
> The sensitivity test most often performed is the slow injection of 0.5 to 1.0 ml of the radiopaque medium, administered intravenously, prior to injection of the full diagnostic dose. It should be noted that the absence of a reaction to the test dose does not preclude the possibility of a reaction to the full diagnostic dose. If the test dose causes an untoward response of any kind, the necessity for continuing with the examination should be carefully reevaluated and, if it is deemed essential, the examination should be conducted with all possible caution. In rare instances, reactions to the test dose itself may be extremely severe; therefore, close observation of the patient, and facilities for emergency treatment, appear indicated."

The chief X-ray technologist for the hospital testified that he was aware of the recommendations; that when plaintiff arrived at the X-ray department, he explained the test procedures to her; that he inquired of her about allergies, specifically about fish, it appearing that fish contain iodine which is also present in the dye; that the sensitivity test was performed unremarkably; that the full amount of the dye (about 50 cc) was then injected into a vein in plaintiff's right arm above the elbow; that he carefully observed plaintiff during the entire procedure and did not notice any reactions or anything unusual about plaintiff; and that plaintiff made no complaints during the procedure.

Plaintiff was then returned to her hospital room and about three hours later was returned to the X-ray department for a cystogram test. She was seated in a wheelchair in a corridor in the X-ray department. The technologist was also in the corridor and noticed that plaintiff was having a seizure. In his words, "her whole neck and head ***

went rigid and went straight back into the chair." A physician arrived in the corridor at the same time and he and the technologist placed plaintiff on a stretcher and took her to the emergency room.

Plaintiff's admitting physician, Dr. Villasenor, examined her there. Her vital signs and blood sugar were normal; a brain wave test was performed, and it was normal. Following the incident plaintiff complained of back pain and X rays were taken of her back on May 25, 1978; these showed a compression fracture of the 11th thoracic vertebra; the films of May 25 were compared with chest X rays made on May 22, the date of the incident, and with older films of the chest made December 12, 1977; neither of the latter showed the fracture. Dr. Villasenor testified that it was possible that the fracture could have occurred during the seizure.

Another physician, Dr. Dunseth, testified on behalf of plaintiff. He stated that based upon his examination of the May 25 X rays his conclusion was that plaintiff had recently suffered a compression fracture of the 11th thoracic vertebra; that the fracture was the result of some sort of trauma, such as an acute flexion injury; that the injury was of a permanent nature, could be painful, and could cause problems in the future.

Plaintiff testified on her own behalf and largely corroborated the sequence of events. She stated that the technologist asked her if she were allergic to fish or iodine, to which she replied in the negative; that he asked no other questions; that while the dye was being injected she complained of a burning at the site; that the technologist replied that this was probably due to the solution with which he had swabbed her arm; that near the conclusion of the procedure her arm was "really hurting" and was "red and beginning to swell up"; that again the technologist stated that it was the swabbing solution; that at the conclusion of the injection she again complained but did not recall what the response was.

Plaintiff further testified that upon her return to her hospital room she felt sick; that the site of the injection had swollen to the extent that it was "half as big as an egg"; that after returning to the X-ray department she still felt nauseated; that she began to feel dizzy and then lost consciousness; that she has experienced pain in her back and takes medication for it. On cross-examination she stated that she complained about the burning in her arm but said nothing about the nausea. She also stated that 42 years previously she had been allergic to the dye used in the cloth of clothbound books, but had never fainted from it.

That was the plaintiff's evidence upon which the directed verdict

was allowed. We view the case in this posture.

■ At the risk of appearing pedantic and repetitious, we will review some of the fundamentals of *res ipsa loquitur* as it applies to medical malpractice. We feel especially compelled to do so by reason of a statement in plaintiff's brief to the effect that causation need not be proved in such a case. This and perhaps other misapprehensions about the doctrine need clarification.

> "The doctrine of res ipsa loquitur is not a rule of law but merely a principle of evidence, and the presumption of negligence raised by application of the doctrine is not absolute or conclusive, but is rebuttable.
>
> \* \* \*
>
> As otherwise stated, res ipsa loquitur does not dispense with plaintiff's proof of negligence, but merely makes the fact of the accident and the circumstances prima facie evidence of negligence \* \* \*." 28 Ill. L. & Prac. *Negligence* sec. 205 (1957).

The traditional elements of a negligence action which a plaintiff must establish in order to prevail are duty, breach of duty, proximate cause and damage. With the advent of comparative negligence in this State, contributory negligence is no longer an issue in the ordinary negligence action. The term "negligence" is oft'times, perhaps too often, loosely used to mean interchangeably the action itself encompassing the four elements just described or just the element of breach of duty. However, it is clear that proof of causation is a necessary element in RIL. The supreme court has said "that the application of the doctrine of *res ipsa loquitur* does not affect the necessity or manner of proof of proximate cause and that it is relevant only to the nature of the proof from which the trier of fact may draw an inference of negligence." *Edgar County Bank & Trust Co. v. Paris Hospital, Inc.* (1974), 57 Ill. 2d 298, 304, 312 N.E.2d 259, 262.

The supreme court has adopted rather specialized terminology in the application of RIL to medical malpractice cases.

> "The *res ipsa loquitur* doctrine is a species of circumstantial evidence permitting the trier of fact to draw an inference of negligence if plaintiff demonstrates that he or she was injured '(1) in an occurrence that ordinarily does not happen in the absence of negligence, (2) by an agency or instrumentality within the defendant's exclusive control, and (3) under circumstances indicating that the injury was not due to any voluntary act or neglect on the part of the plaintiff \* \* \*.' (3 J. Dooley, Modern Tort Law sec. 48.02 (1977)." *Spidle v. Steward* (1980), 79 Ill. 2d 1, 5-6, 402 N.E.2d 216, 218.

These translate into the more traditional terms in our opinion as follows: (1) is breach of duty or negligence; (2) is proximate cause; and (3) is lack of contributory negligence. In medical malpractice cases there is seldom, if ever, a question of duty. The physician is always under a duty to use due care in the treatment of his patient.

It follows that the burden is on the plaintiff to make out a *prima facie* case of all the elements. Once this has been done, the burden then shifts to the defendant to explain. As was said in *Edgar County Bank*:

> "Under these circumstances, when a causal relationship is shown between an intramuscular injection and an injury, as we said in *Metz*, 32 Ill. 2d 446, at 451, 'in view of its superior knowledge of the facts at hand \*\*\*' the defendant hospital 'has the duty to come forward and make explanation.'" *Edgar County Bank & Trust Co. v. Paris Hospital, Inc.* (1974), 57 Ill. 2d 298, 306, 312 N.E.2d 259, 263.

As has been said, we are dealing with a directed verdict at the close of the plaintiff's evidence. The *Pedrick* rule (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14) applies to medical malpractice cases in the same fashion as to other civil litigation. (*Spidle.*) We must therefore examine the plaintiff's evidence in support of her *prima facie* case. Only elements (1) and (2) under the rule of *Spidle* are involved. No contention is made that plaintiff here was guilty of any contributory negligence.

■ The proof of element (1), an occurrence which does not ordinarily happen in the absence of negligence, was controverted. Plaintiff claimed that she complained of burning at the injection site during the administration of the dye; the technologist said that no complaints were heard; however, the manufacturer's instructions state that a family history of allergy is more significant than other data in evaluating. This proof falls far short of what is observed in *Spidle* where the attending surgeon testified that he " 'operated a little too soon' " (*Spidle v. Steward* (1980), 79 Ill. 2d 1, 10, 402 N.E.2d 216, 220) and an expert witness testified that the result was not what one would normally expect. (79 Ill. 2d 1, 8, 402 N.E.2d 216, 219.) There is nothing in the manufacturer's recommendations in the instant case to indicate that a delayed reaction of over three hours might be expected, nor was there any expert testimony in the plaintiff's *prima facie* case to that effect. We also note that the exhibit in the record of these recommendations indicate "Revised September 1978." There is no proof of what the recommendations were in May of 1978. Only the plaintiff's own testimony gives rise to any inference of negligence.

In the same manner, the only proof of element (2), an agency within the defendant's exclusive control, is a single statement by Dr. Villasenor on direct examination by plaintiff's counsel as follows:

"Q. And, Doctor, do you have an opinion based upon reasonable degree of medical and surgical certainty as to whether or not the injection of the dye could or might have caused the reaction or episode that occurred in the wheelchair some two and a half, three hours, whatever the record reflects from your notes—

A. I have not seen this kind of reaction before or reaction would be three hours or so following the injection of I.V.P. in this manner that was—

Q. Okay.

A. —that was described. I have not experienced it.

Q. Can you rule it out, though, completely, Doctor?

A. Okay, couldn't rule it out completely."

It is thus apparent that while plaintiff might have had a scintilla of evidence in support of her elements, that is insufficient under *Pedrick*. The trial court was correct in directing a verdict on the *res ipsa loquitur* count.

Defendant has maintained that the entire question has not been properly preserved for review under *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 415 N.E.2d 337. We have examined the post-trial motion and find it marginally sufficient.

▮▮ Plaintiff's alternative ground for reversal rests upon an allegation of abuse of discretion by the trial court in denying her counsel a continuance. The events leading up to this contretemps form a paragon of the law's delays and resultant poor public image. The complaint was filed June 1, 1979, and is the first entry on the docket sheet in the record. Then ensue 13 pages of docket entries, the last being a motion for extension of time in this court. The case was set for jury trial five times, the last being May 10, 1982. On March 9, 1982, defense counsel by letter informed the court and plaintiff's lead counsel of a possible conflict with a setting in another trial court. No response to the letter appears in the record. On April 7 defense counsel by another letter informed the court and plaintiff's lead counsel that the conflict had been resolved. On April 8 the trial judge sent a letter to all counsel confirming the May 10 trial date. That judge was not resident in Macoupin County. On April 26 plaintiff's lead counsel filed a motion for continuance stating that he had answered ready in two cases in Federal court scheduled for trial during the weeks of May 5 and May 10 and had also answered ready in a case scheduled

for trial in another county during the week of May 5. The motion was denied and the instant case was tried by counsel other than plaintiff's lead counsel. The latter gentleman had been involved since the inception of the case.

A trial court has broad discretion in allowing or denying motions for a continuance, but that discretion must not be exercised arbitrarily. A decisive factor in determining whether a trial court's ruling on a motion for continuance is correct is whether the party applying for the continuance has shown diligence in proceeding with the cause. (*Bullistron v. Augustana Hospital* (1977), 52 Ill. App. 3d 66, 70, 367 N.E.2d 88, 92.) Where more than one attorney is involved in a case, the absence of one of the attorneys at the time of trial does not necessarily mean that the cause must be continued (*Gould v. Elgin City Banking Co.* (1891), 136 Ill. 60, 63-64, 26 N.E. 497, 498; *Heideman v. Kelsey* (1954), 3 Ill. App. 2d 189, 121 N.E.2d 45 (abstract of opinion)), especially where the attorney who tries the case has been involved from the inception of the case (*Ostro, Inc. v. Boydston Brothers, Inc.* (1944), 323 Ill. App. 137, 143, 54 N.E.2d 742, 744), and where the attorney who tries the case is competent to try it. *Gould.*

Lead counsel gave no indication at the time of defense counsel's March 9 letter that any difficulty might appear and likewise did not respond to defense counsel's April 7 letter or the court's letter of April 8 until almost three weeks later. The history of the case recited above shows a similar lack of diligence.

Furthermore, an examination of the record discloses that plaintiff's trial counsel handled the case adequately, especially in view of the paucity of evidence favorable to the plaintiff. There was no abuse of discretion in denying the continuance.

The judgment of the circuit court of Macoupin County is affirmed.

Affirmed.

MILLS and TRAPP, JJ., concur.