# Illinois Official Reports

## Appellate Court

---

### *Johnson v. Armstrong*, 2021 IL App (4th) 210038

---

| | |
|---|---|
| Appellate Court Caption | WILLIAM "WES" JOHNSON, Plaintiff-Appellant, v. LUCAS ARMSTRONG; McLEAN COUNTY ORTHOPEDICS, LTD.; SARAH HARDEN; and ADVOCATE HEALTH AND HOSPITALS CORPORATION, d/b/a Advocate BroMenn Medical Center, Defendants-Appellees. |
| District & No. | Fourth District<br>No. 4-21-0038 |
| Filed | October 28, 2021 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 18-L-126; the Hon. Rebecca S. Foley, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James P. Ginzkey, of Ginzkey Law Office, of Bloomington, for appellant.<br><br>Peter W. Brandt and Kevin M. Toth, of Livingston, Barger, Brandt & Schroeder, LLP, of Bloomington, for appellee Lucas Armstrong.<br><br>Stacy K. Shelly, Troy A. Lundquist, and Scott A. Schoen, of Langhenry, Gillen, Lundquist & Johnson, LLC, of Princeton, for appellees Advocate Health and Hospitals Corporation and Sarah Harden. |

Panel            JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices DeArmond and Cavanagh concurred in the judgment and opinion.

## OPINION

¶ 1        In September 2018, plaintiff, William "Wes" Johnson, filed a complaint alleging defendants, Lucas Armstrong, McLean County Orthopedics, Ltd. (McLean County Orthopedics), Sarah Harden, and Advocate Health and Hospitals Corporation, d/b/a Advocate BroMenn Medical Center (Advocate BroMenn), negligently performed a hip replacement surgery that resulted in Johnson's suffering permanent nerve damage. Johnson advanced two legal theories of recovery: ordinary negligence and *res ipsa loquitur*. Johnson sought to hold Armstrong and Harden directly liable and McLean County Orthopedics and Advocate BroMenn indirectly liable under the doctrine of *respondeat superior*.

¶ 2        In August 2020, defendants Advocate BroMenn and Harden (collectively referred to as Advocate) filed a motion for summary judgment, arguing that Johnson had failed to (1) establish the standard of care for Harden or that she deviated from the standard of care and (2) demonstrate that he met the requirements to invoke the doctrine of *res ipsa loquitur*. In October 2020, the trial court conducted a hearing on Advocate's motion and granted summary judgment in its favor.

¶ 3        In December 2020, Armstrong made an oral motion for summary judgment on the remaining *res ipsa* count, which the trial court granted. The court subsequently entered written orders, entering judgment in the defendants' favor on the *res ipsa* counts and making a finding that the orders were final and appealable pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).

¶ 4        Johnson appeals, arguing that the trial court erred by entering summary judgment against him because (1) he made a *prima facie* showing of the elements of *res ipsa loquitur* and (2) his expert was qualified to testify to the applicable standard of care for Harden. We agree and reverse.

¶ 5                                   I. BACKGROUND

¶ 6                                    A. The Complaint

¶ 7        In September 2018, Johnson filed a four-count complaint alleging defendants negligently injured him during a left, total hip arthroplasty (THA) performed by Armstrong and assisted by Harden. The complaint alleged that the surgery was performed at Advocate BroMenn in October 2016. Following surgery, Johnson had femoral nerve palsy, and subsequent testing revealed he had "severe left femoral neuropathy that is specific to the branches to the vastus lateralis and rectus femoris muscles." (We note that these are two of the muscles that comprise a person's quadriceps.) Johnson alleged, "The lesion appears complete with no evidence of voluntary motor unit potential activation."

¶ 8        Count I alleged ordinary negligence against Armstrong and specifically claimed that Armstrong (1) failed to protect Johnson's femoral nerve, (2) improperly "retract[ed]"

Johnson's femoral nerve, or (3) directly injured Johnson's femoral nerve. Count II alleged McLean County Orthopedics was vicariously liable under the doctrine of *respondeat superior*.

¶ 9 Count III alleged that Armstrong and Harden were negligent pursuant to the doctrine of *res ipsa loquitur*. More specifically, Johnson asserted that (1) Armstrong was assisted by Harden, (2) the injury to Johnson's femoral nerve occurred while the retractors and other surgical instruments were under Armstrong and Harden's control, and (3) Johnson's injuries ordinarily would not have occurred if the standard of care was met. Count IV asserted the same claim against Advocate BroMenn on the basis that Advocate BroMenn employed Harden.

¶ 10 B. Advocate's Motion for Summary Judgment

¶ 11 In August 2020, Advocate filed a motion for summary judgment in which it argued the following. First, Advocate claimed Johnson had not disclosed any expert to testify as to the standard of care for nurse Harden or that she breached her standard of care. Second, Advocate asserted that Johnson's disclosed expert was not qualified to give an opinion on the nursing standard of care and did not offer one at his deposition. Third, Advocate contended that Johnson had not made a *prima facie* case that he was entitled to rely on the doctrine of *res ipsa loquitur* as to Harden because (1) the undisputed facts showed Harden did not have control over the instrumentality of the injury and (2) Johnson's expert did not testify at his deposition that Harden acted negligently. In support of its motion, Advocate attached the depositions of Harden, Pamela Rolf, Armstrong, and Sonny Bal, Johnson's expert.

¶ 12 1. *Deposition of Sarah Harden*

¶ 13 Harden testified that she was a surgical technician, commonly called a "scrub tech." She described her duties as follows: "A second scrub will hold a retractor wherever it is placed by the doctor, and that is pretty much it." "I don't use anything. I hold things." "I hold what I'm told to hold—whatever the doctor tells me to do, I do." Harden repeatedly stated it was not her responsibility to, nor did she ever, place, reposition, move, or otherwise use any instrument during surgery, including retractors. Those actions were always performed by the surgeon, and the surgeon was responsible for the instruments at all times. Harden testified that she had no independent recollection of the surgery but, based on her review of the medical records, she complied with the standard of care.

¶ 14 2. *Deposition of Lucas Armstrong*

¶ 15 At his deposition, Armstrong agreed Johnson did not have femoral nerve palsy before the THA surgery and did have it afterwards. Armstrong stated he placed and moved the retractors and Harden would have done nothing more than hold them. Armstrong further stated that, although he had no independent recollection of the surgery, if Harden would have done something abnormal while holding the retractor, such as moving it, he would have noted that in the records. Armstrong testified that he complied with the standard of care and disagreed that the type of injury Johnson sustained would not ordinarily occur absent negligence.

¶ 16 3. *Deposition of Sonny Bal*

¶ 17 Sonny Bal testified as an expert witness for Johnson. Bal, a retired orthopedic surgeon, stated that before he retired, he performed between 100 and 200 THAs per year on average and

most commonly used the anterior approach, which was the same approach used by Armstrong in this case. Bal agreed that, "as a general proposition," "nerve palsies are a recognized complication of hip replacement surgery." Bal also agreed that, in general, merely because a femoral nerve injury occurs does not mean there is a breach in the standard of care ("I would need more data."). In his career, Bal had two patients develop femoral nerve palsies after THAs. One was caused by internal bleeding putting pressure on the nerve, and the other had an unknown cause. Bal agreed that the cause of femoral nerve palsies was often unknown.

¶ 18 Bal testified, "There's evidence of direct injury to the [femoral] nerve based on the EMG findings." Bal believed the injury was caused by a retractor, an instrument used to hold tissue to allow the surgeon to see the surgical site. Regarding the cause of Johnson's injury, Bal testified as follows:

"The documents I reviewed show misplacement too far medial of the incision, and then twice in the operative record, the doctor documents the placement of the anterior retractor. While documentation does not say that the retractor was up against the femoral nerve, that is my opinion ***.

* * *

*** [Armstrong] does mention placing the retractor up against the rectus femoris muscle, which is where it should be placed, and then moving it to an intracapsular location when he repositioned it once during the operation."

Bal agreed that "[a]s it's stated, [there was] nothing inappropriate about that." Bal agreed that Armstrong's incision, though too far medial, was still within the standard of care.

¶ 19 Bal clarified his testimony that femoral nerve palsies can occur in the absence of negligence and stated the following:

"There are two distinct types of femoral nerve neuropathies, and I want to make sure we're clear on the distinction.

Transient femoral neuropathy injury, neuropraxia palsy, as referred to in this paper *** occurs in the absence of negligence. It is transient; it has a good prognosis; strength returns, and the patient goes on with a temporary time period during which there is a deficit that improves rapidly, and those are what I've encountered in my practice. That palsy can occur and does occur in the absence of negligence from a variety of factors.

My testimony here is a complete injury to the femoral nerve, as occurred here, verified by repeat EMG and subsequent treatment by a nerve specialist like Dr. Tung, does not occur absent negligence."

¶ 20 Bal supported his opinions by stating as follows:

"The medial placement of the incision; the fact that the retractor was moved during surgery; the fact that the two branches that suffered complete injury are to the vastus lateralis and the intermedius, and those would be closer to the retractor than the branch to the medialis, which is further medial; and the fact that the article [presented to Bal by defense counsel during the deposition] clearly states a retractor tip is strikingly close to the femoral nerve when placed near the anterior rim of acetabulum, and one study demonstrated alarmingly high pressures around the nerve during retractor placement."

¶ 21 Throughout the deposition, Bal indicated that, based on his experience and literature he reviewed, only transient femoral nerve palsies were known complications and outcomes that occurred in the absence of negligence. Bal testified that Johnson suffered a complete injury to

two branches of his femoral nerve and the loss of muscle function and other symptoms he experienced were permanent. In sum, Bal indicated his opinion was that the permanent injury suffered did not occur in the absence of negligence.

¶ 22            C. The Hearing on Advocate's Motion for Summary Judgment

¶ 23      In October 2020, the trial court conducted a hearing on Advocate's motion for summary judgment. Advocate argued that Johnson had not disclosed a nursing expert and Bal was not qualified to give an opinion as to the standard of care for a surgical technician. Advocate further argued that Johnson had not demonstrated that Harden exercised any control over the retractor that allegedly caused the injury; Armstrong placed and moved the retractor, and Harden merely held it in place. Harden had no part in deciding where to place the retractor or whether to move it.

¶ 24      Johnson acknowledged, "with reference to the fact that we don't have a nursing expert, that's absolutely correct, but that's because a nursing expert cannot render an opinion on what is or is not appropriate with respect to an orthopedic surgical procedure." Johnson maintained, "As a matter of law, it has to be testimony from an orthopedic surgeon, and we have that here." Bal opined the injury was caused by a retractor and the undisputed facts showed that Harden held the retractor. ("I think the evidence at trial will be that she held the retractors only after they were placed or moved by Dr. Armstrong, but that doesn't affect the fact that she's the one holding the retractors and that's when the damage occurred.") Johnson further noted that Bal unequivocally stated that the type of injury sustained, complete denervation of two quadriceps, does not occur in the absence of negligence.

¶ 25      Advocate noted that "all the testimony says that [Harden] did exactly what was expected." Advocate maintained that Johnson had to show Harden performed a negligent act and he had failed to do so.

¶ 26      The trial court agreed with Advocate. The court explained that Johnson was still required to show the standard of care and a breach of that standard. "Plaintiff has disclosed only one expert, Dr. Sonny Bal." The court ruled that Bal was not qualified to give an opinion relative to the nursing standard of care because "he does not practice within the same school of medicine as Nurse Harden, namely nursing." The court further noted that the record did not contain any evidence that Harden committed a negligent act or omission.

¶ 27      The trial court stated as follows: "All witnesses testified that Defendant Armstrong, as the surgeon, placed the retractor. While Defendant Harden may have physically held the retractor upon placement, it was only at the direction of Defendant Armstrong. She did not exercise any independent control over any surgical tools, according to the testimony." "Furthermore, the witnesses agree she only acted as directed, and she did not take any actions other than those directed by Dr. Armstrong. Accordingly, the retractor was never under the exclusive control of Nurse Harden." The trial court granted summary judgment to Harden and to Advocate BroMenn because Advocate BroMenn was named as a defendant solely under *respondeat superior*.

## D. Subsequent Proceedings

In November 2020, Johnson filed a motion to reconsider the trial court's granting of Advocate's motion for summary judgment. In December 2020, the trial court conducted a hearing on that motion and denied it.

Later in December 2020, at a hearing on a discovery matter, Armstrong orally moved for summary judgment, and the trial court granted his oral motion. On December 22, 2020, the trial court entered a written order entering summary judgment in favor of Armstrong on count III and finding no just reason for delaying enforcement or appeal of that order pursuant to Rule 304(a). The trial court stayed any pending litigation on the remaining counts against Armstrong and McLean County Orthopedics.

In January 2021, the trial court entered a written order (1) granting summary judgment in favor of Advocate and (2) finding no just reason for delaying the appeal of its order.

This appeal followed.

## II. ANALYSIS

Johnson appeals, arguing that the trial court erred by entering summary judgment against him because (1) he made a *prima facie* showing of the elements of *res ipsa loquitur* and (2) he did not need a nursing expert to testify to the applicable standard of care for Harden. We agree and reverse.

As an initial matter, the defendants make several arguments that Johnson has, for various reasons, forfeited his ability to challenge the trial court's judgment. We disagree with these assertions and address this case.

### A. The Applicable Law
#### 1. *Summary Judgment*

Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed, or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Monson v. City of Danville*, 2018 IL 122486, ¶ 12, 115 N.E.3d 81. When examining whether a genuine issue of material fact exists, a court construes the evidence in the light most favorable to the nonmoving party and strictly against the moving party. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22, 131 N.E.3d 488.

Summary judgment is a drastic means of disposing of litigation and "should be allowed only when the right of the moving party is clear and free from doubt." (Internal quotation marks omitted.) *Id.* A trial court's entry of summary judgment is reviewed *de novo*. *Id.*

### 2. Res Ipsa Loquitur

"The doctrine of *res ipsa loquitur* allows the trier of fact to draw an inference of negligence from circumstantial evidence when direct evidence of the cause of the injury is primarily within the knowledge and control of the defendant. [Citation.] [T]he doctrine is not a separate theory of liability [but] a type of circumstantial evidence which permits the trier of fact to infer

negligence when the precise cause of injury is not known by the plaintiff." (Internal quotation marks omitted.) *Poole v. University of Chicago*, 186 Ill. App. 3d 554, 558, 542 N.E.2d 746, 748-49 (1989).

¶ 42 "The trial court must decide whether the doctrine applies as a question of law, subject to *de novo* review." *Willis v. Morales*, 2020 IL App (1st) 180718, ¶ 36, 169 N.E.3d 74. "[A] plaintiff seeking to rely on the *res ipsa* doctrine must plead and prove that he or she was injured (1) in an occurrence that ordinarily does not happen in the absence of negligence, (2) by an agency or instrumentality within the defendant's exclusive control." *Heastie v. Roberts*, 226 Ill. 2d 515, 531-32, 877 N.E.2d 1064, 1076 (2007).

¶ 43 "If the plaintiff was unconscious at the time of the injury, and under the defendants' control, then the plaintiff has adequately shown the control element for *res ipsa loquitur*, even if she cannot establish the exact instrumentality that caused the injury." *Willis*, 2020 IL App (1st) 180718, ¶ 37. Further, "if [the plaintiff] can convince a finder of fact that the injury occurred during the surgery, 'it can be inferred *** that the instrumentality of the injury was the handling' of [the plaintiff] by defendants." *Id.* (quoting *Collins v. Superior Air-Ground Ambulance Service, Inc.*, 338 Ill. App. 3d 812, 820, 789 N.E.2d 394, 401 (2003)).

¶ 44 "[U]nder Illinois precedent, [a] plaintiff is not required to show that his injuries were more likely caused by any particular one of the defendants in order to proceed with his *res ipsa* claim, nor must he eliminate all causes of his injuries other than the negligence of one or more of the defendants." *Heastie*, 226 Ill. 2d at 533-34. "In order to show the first element of *res ipsa loquitur*, an occurrence that ordinarily does not happen in the absence of negligence, a plaintiff is not required to show that the injury in question never happens without negligence, only that it does not ordinarily happen without negligence." *Adams v. Family Planning Associates Medical Group, Inc.*, 315 Ill. App. 3d 533, 545, 733 N.E.2d 766, 775-76 (2000).

¶ 45 "A plaintiff need not conclusively prove all the elements of *res ipsa loquitur* in order to invoke the doctrine. He need only present evidence reasonably showing that elements exist that allow an inference that the occurrence is one that ordinarily does not occur without negligence." *Dyback v. Weber*, 114 Ill. 2d 232, 242, 500 N.E.2d 8, 12 (1986).

> "Illinois law does not require a plaintiff to show the actual force which initiated the motion or set the instrumentality in operation in order to rely on the *res ipsa* doctrine. To the contrary, if the specific and actual force which initiated the motion or set the instrumentality in operation were known unequivocally, leaving no reason for inference that some other unknown negligent act or force was responsible, the *res ipsa* doctrine could not even be invoked." *Heastie*, 226 Ill. 2d at 539.

¶ 46 B. Johnson Made a *Prima Facie* Showing of the Elements of *Res Ipsa Loquitur*

¶ 47 1. *The Injury Was One That Ordinarily Does Not Occur Absent Negligence*

¶ 48 Bal's testimony indicated that he had performed hundreds of hip replacements and had not encountered an injury such as the one Johnson had. Bal further stated that his review of the literature regarding injuries to the femoral nerve during a total hip replacement showed that the injuries experienced were transient or temporary and, to the extent such injuries continued, they were not anywhere near as severe as those Johnson experienced. Bal's deposition testimony adequately set forth his opinion that a severe and permanent injury to the femoral nerve does not occur in the absence of negligence and the factual bases therefor.

¶ 49    In *Spidle v. Steward*, 79 Ill. 2d 1, 8, 402 N.E.2d 216, 219 (1980), the Illinois Supreme Court acknowledged that had the expert in that case testified that the injury would not have occurred ordinarily in the absence of negligence, such testimony "would have established directly plaintiff['s] initial burden with respect to the probability component." "Such a direct answer *** would be sufficient initially even though it would not have constituted proof that [the injury at issue] never happen[s] without negligence." *Id.* at 9.

¶ 50    In *Poole*, the plaintiff's expert testified that although vocal cord paralysis was a known risk of a subtotal thyroidectomy, "*bilateral* vocal cord paralysis ordinarily would not have occurred in the absence of a deviation from the standard of care." (Emphasis in original.) *Poole*, 186 Ill. App. 3d at 556. The appellate court held that the jury should have been given the *res ipsa loquitur* instruction even though (1) the defense expert testified that the bilateral injury was a known complication and (2) the plaintiff's evidence "did not conclusively prove how or why the nerves [responsible for the injury] were damaged." *Id.* at 559-60.

¶ 51    Bal opined that a retractor caused the injury. His opinion was based on the medial location of the incision, which would have increased the proximity of the retractor to the branches of the femoral nerve that were ultimately permanently injured and increased the risk of damage. Bal acknowledged that the location of the incision was not a violation of the standard of care despite the increased risk of nerve damage.

¶ 52    Although Bal agreed that femoral nerve injuries were a known risk of total hip replacement surgery, he clarified that the type and degree of such injuries were limited to transient symptoms that eventually resolved or to mild symptoms that were generally tolerable. Bal unequivocally stated that Johnson's injury, a permanent denervation of multiple branches of the femoral nerve resulting in the inability to use two of his quadricep muscles, was not the type of injury that would have occurred in the absence of negligence.

¶ 53    Almost 40 years ago, this court examined whether the plaintiff in a medical malpractice case presented sufficient evidence in her case in chief to invoke the *res ipsa* doctrine and withstand a directed verdict. See *McMillen v. Carlinville Area Hospital*, 114 Ill. App. 3d 732, 737-38, 450 N.E.2d 5, 10 (1983). In affirming the directed verdict in the defendant's favor, we noted that the expert testified merely that the plaintiff's reaction was unexpected and the doctor " 'couldn't rule it out completely' " that the injection caused the injury. *Id.* at 738. We then concluded, "It is thus apparent that while plaintiff might have had a scintilla of evidence in support of her elements, that is insufficient ***." *Id.* By contrast, Bal testified the retractor caused the injury and explained that the injury was not merely unexpected, but instead was so severe that it would not have occurred absent negligence.

¶ 54    Bal's deposition testimony was sufficient to establish a genuine issue of material fact regarding the cause of Johnson's injury. Johnson was not required to eliminate all possible causes of the injury, nor was he required to show that the injury could *only* be the result of negligence. The plain language of the *res ipsa* statute is clear: "Proof of an unusual, unexpected or untoward medical result which *ordinarily* does not occur in the absence of negligence *will suffice* in the application of the doctrine." (Emphases added.) 735 ILCS 5/2-1113 (West 2018). Bal's testimony went much further, opining that he had never seen nor read about such an injury occurring in the absence of negligence. Although defendants are correct that an unexpected result is not enough on its own to invoke the *res ipsa* doctrine, such a result is sufficient when coupled with expert testimony that the result does not ordinarily occur in the absence of negligence. *Spidle*, 79 Ill. 2d at 9.

- 8 -

¶ 55               *2. Harden Had Control of the Retractor for* Res Ipsa *Purposes*

¶ 56        Advocate contends Johnson failed to establish that the instrumentality of the injury—the retractor—was within the control of Harden or other agents of Advocate BroMenn. In fact, Advocate argues, the deposition testimony unequivocally shows that Armstrong had exclusive control over the retractors because each occurrence witness testified to the same. We disagree. As we explain, Advocate misconstrues the showing necessary to establish control.

¶ 57        "In *res ipsa loquitur* and alternative liability situations, all parties who could have been the cause of the plaintiff's injuries are joined as defendants." *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 257, 560 N.E.2d 324, 339-40 (1990). "A plaintiff's failure to name as defendants all of the entities who might have caused his injuries is fatal to the action since the plaintiff must eliminate the possibility that the accident was caused by someone other than any defendant." (Internal quotation marks omitted.) *Raleigh v. Alcon Laboratories, Inc.*, 403 Ill. App. 3d 863, 869, 934 N.E.2d 530, 536 (2010).

¶ 58        Advocate is correct that Harden, Armstrong, and even Bal testified at their depositions that Armstrong was the only person to place, reposition, or otherwise move the retractor. They all similarly testified that although Harden physically held the retractor, she did so only as instructed by Armstrong. In other words, Armstrong was responsible for the retractor at all times.

¶ 59        However, this testimony establishes precisely why Harden was in control of the retractors in the sense necessary to support the elements of *res ipsa loquitur*. As explained, *res ipsa loquitur* is a form of proof available when the plaintiff can establish that an injury would not have occurred in the absence of negligence but cannot conclusively establish the precise cause of the injury. *Poole*, 186 Ill. App. 3d at 558. Harden testified that the job of a surgery technician is to follow the surgeon's instructions precisely and not move or use (other than by holding in place) any surgical instrument. Obviously, if a surgical technician *did* move an instrument or hold that instrument incorrectly and an injury occurred as a result, the technician would be liable.

¶ 60        The undisputed evidence shows that Harden held the retractor. Bal testified that, in his opinion, the retractor caused the injury. Bal further testified that permanent and severe nerve damage to the femoral nerve does not occur in the absence of negligence. Accordingly, Johnson made a *prima facie* showing of the elements of *res ipsa loquitur*.

¶ 61        Although none of the people present during the surgery testified at their depositions that Harden acted improperly, this is not unexpected. Even Bal agreed during his deposition that from his review of the medical records, Armstrong complied with the standard of care. But that is precisely why the *res ipsa loquitur* doctrine applies: the injury speaks for itself. Bal explained that even though the documentation *says* all of the right things, in his opinion—based on his education and experience—the outcome was one that would not have occurred in the absence of negligence. That is, if the medical records and deposition testimony of the occurrence witnesses accurately reflected what happened, then Johnson would not have suffered permanent nerve damage.

¶ 62        In *Willis*, the experts testified that the plaintiff's injuries could have occurred in any number of ways caused by any number of people, such as a nurse placing too much pressure on a particular area. Likewise, in this case, Harden could have accidentally or unknowingly held the retractor in such a way as to cause the injury.

¶ 63        It is important to note that the inference of negligence is not the same in every case or even as to each defendant. Bal's opinion was that Armstrong improperly placed the retractor so as to damage the femoral nerve. At trial, even if Advocate did not present any evidence, the jury would be free to reject the inference of negligence based on the mere fact that none of the witnesses identified a single thing Harden did wrong. See *Imig v. Beck*, 115 Ill. 2d 18, 27, 29, 503 N.E.2d 324, 329 (1986) ("The inference may be strong, requiring substantial proof to overcome it, or it may be weak, requiring little or no evidence to refute it. The weight or strength of such inference will necessarily depend on the particular facts and circumstances of each case and is normally a question of fact to be determined by the jury." "Since the doctrine gives rise only to a permissive inference, in most cases a directed verdict for the plaintiff will not be appropriate, even where the defendant presents no explanation or rebuttal, because it must be left to the jury whether to draw the inference of negligence from the circumstances of the occurrence."). But if Johnson did not include Harden as a defendant, Armstrong could, quite rightly, argue to the trial court that the *res ipsa* doctrine was not appropriate because Harden had physical control over the instrumentality of the injury during the surgery.

¶ 64        3. *Johnson Did Not Need an Expert to Establish Harden's Standard of Care*

¶ 65        The whole point of the *res ipsa* doctrine is to provide an alternative method of proof when the injury would be otherwise unexplainable. Once a plaintiff establishes, through sufficient expert testimony, that the injury is one that would not ordinarily occur in the absence of negligence, and *res ipsa* applies, all defendants alleged to be in control of the instrumentality that allegedly caused the injury must be named defendants, and no further standard of care testimony is required.

¶ 66        If Advocate were correct, the same argument could be made successfully in the prototypical *res ipsa* case: a sponge left in a patient following surgery. Had this occurrence happened to Johnson, it would be no defense for Harden or Armstrong to state that the undisputed evidence shows that neither of them did anything wrong or that Johnson did not present any testimony as to what a reasonably careful surgeon or surgical technician would have done. The sponge was still left in the patient, and *someone's* negligence during that operation was responsible for that error.

¶ 67        The essence of *res ipsa loquitur* is that the *injury* speaks for itself. Were it otherwise, there would be no need for the doctrine. Armstrong and Harden would be home free because Johnson could never find an expert to suggest that either one did something specifically wrong because all the records and testimony would point in the opposite direction.

¶ 68        Here, Johnson needs an expert to explain to the jury whether or not the type of injury in this case is the total-hip-replacement equivalent of leaving a sponge in a patient. However, the circumstances of the injury themselves—*i.e.*, going to a hospital, being rendered unconscious, and having surgery performed—unquestionably establish that those in control of the patient have a duty to exercise ordinary care and not injure the patient by violating that duty. In essence, the *control* element of the *res ipsa* doctrine is sufficient to establish a duty of care. Expert testimony is required to show that the injury is not one that would ordinarily occur absent negligence. The jury must then decide whether the resulting inference of negligence is sufficient to establish liability.

¶ 69        Advocate cites *Taylor v. City of Beardstown*, 142 Ill. App. 3d 584, 491 N.E.2d 803 (1986). We acknowledge that 35 years ago, this court held in *Taylor* that testimony regarding the

standard of care and deviation from that standard was required to invoke the *res ipsa* doctrine. *Id.* at 593. We note that, as far as we can tell, the only other case to make such an explicit statement or rely on *Taylor* for that same proposition is *Smith v. South Shore Hospital*, 187 Ill. App. 3d 847, 857-58, 543 N.E.2d 868, 873 (1989), which itself has never been cited for that proposition. Indeed, in *Solon v. Godbole*, 163 Ill. App. 3d 845, 850, 516 N.E.2d 1045, 1048 (1987) (quoting *Plost v. Louis A. Weiss Memorial Hospital*, 62 Ill. App. 3d 253, 258, 378 N.E.2d 1176, 1180 (1978)), the Third District noted, "[A] plaintiff may proceed to trial without an expert '*** where the theory is "*res ipsa loquitur*." ' " We decline to follow *Taylor*.

¶ 70        Additionally, Illinois Supreme Court cases indicate that a plaintiff need demonstrate only a *prima facie* case of the elements of *res ipsa loquitur* to be entitled to proceed to trial using that method of proof. This reasoning makes sense because the plaintiff may have no idea how the injury happened and, as in this case, the medical records may state that everything occurred normally and the providers complied with the standard of care. Quoting a California case, the Illinois Supreme Court wrote the following:

> " 'The present case is of a type which comes within the reason and spirit of the doctrine more fully perhaps than any other. *** [I]t is difficult to see how the doctrine can, with any justification, be so restricted in its statement as to become inapplicable to a patient who submits himself to the care and custody of doctors and nurses, is rendered unconscious, and receives some injury from instrumentalities used in his treatment. Without the aid of the doctrine a patient who received permanent injuries of a serious character, obviously the result of someone's negligence, would be entirely unable to recover unless the doctors and nurses in attendance voluntarily chose to disclose the identity of the negligent person and the facts establishing liability.
>
> * * *
>
> *** The control, at one time or another, of one or more of the various agencies or instrumentalities which might have harmed the plaintiff was in the hands of every defendant or of his employees or temporary servants. This, we think, places upon them the burden of initial explanation.' " *Kolakowski v. Voris*, 83 Ill. 2d 388, 395-96, 415 N.E.2d 397, 400-01 (1980) (quoting *Ybarra v. Spangard*, 154 P.2d 687, 689-90 (Cal. 1944)).

¶ 71        The Illinois Supreme Court also wrote the following in *Spidle*:

> "In addition, the [*res ipsa*] doctrine is useful in combatting the reluctance of medical personnel to testify against one another. (*Sanders v. Frost* (1969), 112 Ill. App. 2d 234, 241; Prosser, Torts sec. 39, at 227 (4th ed. 1971).) Doctors, for example, 'may be more willing to testify that the injury was of a kind which would not ordinarily occur in the exercise of due care than they would be to specify those acts which constituted negligence.' Note, *The Application of Res Ipsa Loquitur in Medical Malpractice Cases*, 60 Nw. U.L. Rev. 852, 865 (1966)." *Spidle*, 79 Ill. 2d at 6.

¶ 72                                   III. CONCLUSION
¶ 73        For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

¶ 74        Reversed and remanded.